E-filing

GEOFFREY BECKER
BECKER & BECKER
1370 Reliez Valley Road
Lafayette, California 94596
Telephone: [925] 939-9041
State Bar No. 70110

Attorney for Plaintiff, Daniel Long

ORIGINAL

FILED
JUN 25 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Daniel Long,<br><br>Plaintiff,<br><br>Forty Niners Football Company LLC and John York<br><br>Defendants. | NO. C13-2919 JSC<br><br>Complaint for Breach of Contract, Negligence, Liability Under the Rescue Doctrine and Punitive Damages |

1. Jurisdiction

The court's jurisdiction to hear this case is based on the diversity of citizenship that exists between the parties and the fact that the amount in controversy exceeds $75,000.

28 U.S.C. §1332.

The plaintiff is a resident of California, the Forty Niners Football Company, LLC is a Delaware Limited Liability Company and John York is a resident of the state of Ohio. John York was a general partners of the entity that

owned the National Football team known to everyone as the 49ers when Daniel Long was shot on August 20, 2011 in the Candlestick Park parking lot.

2. Venue

Venue in the Northern District of California is appropriate because the Forty Niners Football Company, LLC is doing business in the City of Santa Clara and the acts giving rise to this lawsuit occurred in the City and County of San Francisco.

(General Allegations)

3. On August 12, 2011, the plaintiff purchased a stadium ticket which allowed him to sit on the 50 yard line during the August 20, 2011 49er/Raider game and a parking lot pass allowing him to park in the Candlestick Park parking lot. The following language from the stadium ticket appears in Arial 6 point type on a silver background:

"This ticket only grants entry into the stadium and a spectator seat for the specified NFL game. This ticket is a revocable license. Admission may be refused or ticket holder ejected in the sole discretion of the Forty Niners. The Forty Niners may refuse admission to, or eject, any ticket holder who is deemed to be disorderly, or who fails to comply with these terms or any and all security measures. The ticket holder assumes all risks incident to the game or related events, including the risk of lost, stolen or damaged property or personal injury. Ticket holder will not transmit or aid in transmitting any picture, account or description [whether text, data or visual] in any media now or hereafter existing of all or any part of the football game or related events. Breach of the foregoing may result in legal action against the holder. The ticket holder grants to the NFL, the Forty Niners and their designees the irrevocable permission to use his or her voice, likeness, name and image in any media now or hereafter existing captured in connection with the football game or related events, for any purpose whatsoever, including the commercial purposes of the NFL, the Forty Niners, and their sponsors, licensees, advertisers or broadcasters. This ticket cannot be replaced if lost, destroyed or stolen. All sales are final. Lost, stolen or counterfeit tickets, or those offered for resale at an unlawful premium, may not be honored. The ticket holder may not enter the stadium or otherwise use this ticket for advertising, promotion or other commercial purposes (including contests, sweepstakes and giveaways) without the NFL's and the Forty Niners express written consent. You and your belongings may be searched upon entry into the Stadium, and prohibited items may be confiscated. By tendering this ticket and entering in the Stadium, you consent to such searches and waive any related claims you might have against the NFL, its member clubs, their affiliates and stadium landlord, or their agents. If you elect not to consent to the searches, you will be denied entry into the Stadium. All persons, 2 years of age or older, must have a ticket for admittance.

THE DATE AND TIME OF THE GAME AS WELL AS THE OPPONENT ARE ALL SUBJECT TO CHANGE (WITHOUT NOTICE) BY THE NFL IN ITS SOLE DISCRETION OR AS A RESULT OF EVENTS BEYOND THE NFL'S CONTROL, WITHOUT REFUND, IF GAME IS CANCELED AND NOT REPLAYED. THE SOLE AND EXCLUSIVE REMEDY IS A REFUND OF THE FACE VALUE OF THE TICKET TO THE ORIGINAL PURCHASER OF THE TICKET.
TO REPORT UNRULY FANS:
1. TEXT TO "69050"

2. TYPE A KEYWORD "BAD FAN" AND A <SPACE>

3. DESCRIBE THE ISSUE AND LOCATION. BE SPECIFIC (I. E., MAN USING OBSCENITIES IN UPPER BOX 61, ROW 1 SEAT 1)"

4. Prior to the plaintiff's purchase of the stadium ticket, the 49ers' stadium procedures and policy stated that the 49ers were committed to proactively creating an environment where patrons and their families, friends and/or clients can enjoy their experience free from fighting, taunting, or threatening remarks and/or gestures and gang activity and that it was committed to creating and maintaining a safe and enjoyable experience for all guests visiting Candlestick Park. The 49ers' stadium procedures and policy also stated that the 49ers are committed to creating and maintaining a safe and enjoyable experience for all guests visiting Candlestick Park, and;

a. The 49ers Game Day Security Policies stated that "The San Francisco 49ers security protocols have been evaluated every year by the National Football League based upon their Best Practices for Stadium Security and Best Practices for Fan Conduct. Every year the 49ers have received a level "1" evaluation, which is the highest level that can be achieved".

5. The parking lot pass referred to in paragraphs 2 states as follows:

**THIS CONTRACT LIMITS OUR LIABILITY-READ IT!!!**

Contract; customer leaves car at their own risk. This ticket licenses the holder to park ONE AUTOMOBILE in the parking area designated by operator upon customer arrival. Park properly unlock your car. Only rental space license granted in no bailment is created. NO REFUNDS FOR LOST, STOLEN OR UNUSED PARKING PASSES. **TICKET MUST BE INTACT UPON CUSTOMER ARRIVAL.**

A) the failure a person to obey managements rules and regulations including verbal instructions or direction, may result in eviction from the 49ers Parking Lots. Eviction constitutes forfeiture and/or cancellation of parking privileges without compensation.

B) Any vehicle or vehicles that park in aisle ways, driveways, fire lanes or any other unauthorized areas (including failure to park between the painted lines) will be cited or code and stored at the owner's expense. For information regarding towed vehicles, please contact the San Francisco 49ers Stadium operations office at (4 1 5 6 5 6 – 4 9 4 9.

C) Resale or attempted resale of this license is prohibited. No employee or agent may alter or enlarge our liability hereunder orally or otherwise.

D) The San Francisco 49ers or its agents shall not be responsible for fire, theft, damage or loss to said automobile or any other article left in the same.
E) This constitutes the entire contract and acceptance of this check constitutes acknowledgment by the holder he/she has read and agrees to the foregoing.

6. Defendants knew about the probability weapons would be brought into the parking lot for the 2011 pre-season game, that they would not be detected and that they would be used in the parking lot. Each of the defendants knew that in the 49er/Raider game a year earlier, there was a stabbing in a 49er parking lot which occurred after kickoff. They knew that other NFL teams had successfully implemented a policy to search vehicles entering their parking lots for the purpose of attending a professional football game or for the purpose of tailgating with respect to those games. Approximately 30 to 45 minutes prior to the assault on the plaintiff, defendants knew that a shooting had occurred in one of the Candlestick Park parking lots where the plaintiff had parked his car and that the assailant and gun had not been found.

7. At the conclusion of the game, Gabriel Navarrette was attacked in the Candlestick Park parking lot and was beaten unconscious. Daniel Long attempted to rescue him from the attack and was shot four times.

8. Numerous fights occurred during the August 20, 2011 pre-season game and one 49ers patron was severely beaten in a stadium bathroom during the game.

9. Plaintiff is informed and believes and based on this information and belief alleges that:

a. In or around the period 1982-1988, 49ers senior management knew that it was not safe for patrons to attend the 49er/Raider games. During this time period, 49ers senior management told team members, but not the paying public, that their families should not attend the 49er/Raider games because it was not that safe to be around. They were advised to sit it out and watch it on television.

b. Plaintiff is informed and believes and based on this information and belief alleges that during this time period, the 49ers did not inform the NFL that it was advising team members that their families should not attend the Raider games. Plaintiff is also informed and believes and based on this information and belief alleges that the 49ers did not inform the NFL that even though it was advising team families not to attend, it was not advising the general public not to attend.

c. Plaintiff is informed and believes and based on this information and belief alleges that in the year preceding the August 20, 2011 49er/Raider game, 49er senior management knew that the safety concerns expressed more than 25 years earlier had not abated and in fact had escalated with the stabbing in a parking lot adjacent to Candlestick Park immediately after kickoff of the 2010 49er/Raider game.

11. Plaintiff is informed and believes and based on this information and belief alleges that the defendants, and each of them, had the ability to take reasonable measures to prevent weapons from being brought into the parking and had the ability to prevent plaintiff's shooting.

12. With knowledge that there was not a significant increase in parking lot security after the game, with knowledge that weapons could have been brought into the parking lot and would not have been detected by the stadium search, with knowledge of the severe beating in a stadium bathroom during the game, with knowledge that it would soon be getting dark in the parking lot and that the parking lot would be difficult to keep safe, with knowledge of the beating at the March 31, 2011Giants/Dodgers game, with knowledge that a shooting had already occurred in the Candlestick Park parking lot before the plaintiff was shot and that the gun and assailant had not been found, the defendants, and each of them, did not take reasonable measures to prevent the plaintiff from being shot while attempting to rescue another patron who was being beaten in the Candlestick Park parking lot.

13. The contractual relationships between the 49ers and the plaintiff,

the 49ers superior knowledge about the beating in the bathroom during the game and the shooting in the parking lot after the game, its superior knowledge that security would not be increased after the game in the parking lot, all required the 49ers to disclose to the plaintiff that it was not safe for him to enter and remain in the parking lot or to warn him that it would be dangerous for him to do so before it was determined that the parking lot was safe to enter.

**FIRST claim FOR RELIEF**

14. Plaintiff realleges and incorporates by this reference, paragraphs 1 through 14 of this Complaint as though set forth fully herein.

15. The lease allowing the 49ers to play their games at Candlestick Park required the 49ers to keep the parking lot where plaintiff was shot, safe and prior to plaintiff's purchase of the stadium ticket and parking lot pass, the 49ers knew that the parking lot was not safe. In fact, defendants knew the security systems in place in the parking lot were antiquated.

16. That by reason of the purchase of the stadium ticket and parking lot pass, by reason of the 49ers stadium procedures and policies that it was proactively creating an environment that was free from fighting, taunting, or threatening remarks and/or gestures and gang activity; by reason of its stadium procedures and policies that the 49ers are committed to creating and maintaining a safe and enjoyable experience; by reason of the leasehold obligation to keep the parking lot safe the 49ers impliedly promised the plaintiff that it would:

a. Provide adequate security in the parking lot where plaintiff had parked and that it would implement reasonable security measures in the parking lot;

b. Warn the plaintiff that it was not safe for him to enter the parking lot following the game until it was determined that the parking lot was safe to enter;

17. The 49ers did not provide adequate security in the parking lot where plaintiff had parked; it did not implement reasonable security measures in the parking lot; it did not warn the plaintiff that it was not safe for him to enter the parking lot

following the game until it was determined to be safe to enter and in so failing, breached the implied promises it made to the plaintiff;

18.As a direct result of the aforesaid breaches, the plaintiff was generally damaged and has suffered consequential damages which the 49ers knew were reasonably certain to occur in the event the plaintiff was shot.

19.Plaintiff performed all conditions precedent required to be performed.

## SECOND CLAIM FOR RELIEF

20. Plaintiff realleges and incorporates by this reference, paragraphs 1 through 19 of this Complaint as though set forth fully herein.

21. The Forty Niners Football Company, LLC agreed with the Oakland Raiders to play the game at 5:00 p.m. knowing that at the conclusion of the game, patrons would be leaving a well lit stadium and entering a dark parking lot. The defendants, and each of them, did not take reasonable measures to prevent the shooting; they failed to provide adequate security in the parking lot following the game and to employ reasonable security measures to protect the plaintiff, they failed to determine whether the parking lot was safe for the plaintiff to enter following the game; they failed to warn the plaintiff and Mr. Navarrette about the shooting that had already occurred in the parking lot; and they exposed them to risk of injury in the parking lot when they could have allowed them to remain in the stadium until the shooter and gun were found or until such time as it was determined it was safe for them to enter the parking lot.

22. When the plaintiff purchased the stadium ticket and parking lot pass, and when the plaintiff attended the game, the Forty Niners Football Company, LLC knew that the security systems in place for the game were antiquated. It knew that it could not provide adequate security to protect the plaintiff and Gabriel Navarrette while they were in the Candlestick Park parking lot.

23. For an unknown period of time before the game and prior to the

Bryan Stow attack at Dodger Stadium on March 31, 2011, the Forty Niners Football Company, LLC , as lessee of Candlestick Park, did not have a video surveillance system for the parking lot. Without such a system, it knew that it could not remotely monitor inappropriate behavior and criminal activity in the parking lot.

24. The Forty Niners Football Company, LLC did not make the security systems at Candlestick Park adequate for the rivalry game between the 49ers and Raiders and they knew that they could not adequately protect patrons leaving the stadium after the first shooting and entering the parking lot until such time as the shooter and gun were found or until such time as it was determined that the parking lot was safe to enter. Before the NFL scheduled the game, the 49ers did not request that the game not be scheduled because of the antiquated parking lot security. Before the game, the 49ers did not inform the NFL about the parking lot stabbing a year earlier because if it had, the NFL would have required the 49ers to provide additional security which the 49ers did not want to provide because of it's cost.

25. The Forty Niners Football Company, LLC knew that Coach Walsh told his players to tell their families when the 49ers were playing the Raiders, that they should sit it out and watch the game on television because it was not that safe to be around. For reasons not known, the 49ers did not tell the NFL what Coach Walsh was telling his players.

26. The Forty Niners Football Company, LLC consciously disregarded the plaintiff's safety in the following respects:

a. It knew that weapons could be brought in the parking lot and it did not doing anything to prevent that from happening;

b. It knew that a gun had been brought into the parking lot and had been used in a shooting 30 to 45 minutes prior to plaintiff's shooting;

c. While Mr. Navarrette and the plaintiff were in the stadium after the first shooting, it did not do anything to keep them from entering the parking lot

even though the shooter and gun had not been found when they were allowed to enter the parking lot.

d. It knew that Landmark Security people had not been directed to the parking lot after the game and it knew that all available police officers in the parking lot were summoned to the first shooting leaving the remainder of the dark parking lot unprotected.

That by reason of the Forty Niners Football Company, LLC's conscious disregard for the plaintiff's safety it is responsible for punitive damages.

**THIRD CLAIM FOR RELIEF**

25. Plaintiff realleges and incorporates by this reference, paragraphs 1 through 15 of this Complaint and 21 through 25 as though set forth fully herein.

26. The Forty Niners Football Company, LLC owed a duty of care to Gabriel Navarrette with respect to the football game referred to herein because he paid for a stadium ticket and parking lot pass.

27. The Forty Niners Football Company, LLC breached its duty of care and the breach of this duty was a substantial factor in bringing about Gabriel Navarrette's beating and the rescue attempt by the plaintiff.

28. It was reasonably foreseeable to the Forty Niners Football Company, LLC that when Gabriel Navarrette was being attacked, someone would attempt to rescue him, Daniel Long attempted to stop the beating and was shot.

29. As a direct result of Daniel Long's rescue efforts, he was severely injured and has suffered and will continue to suffer economic and non-economic damages.

///

///

///

Case3:13-cv-02919-JSC Document1-1 Filed06/25/13 Page10 of 10

1. For general and consequential damages in the first cause of action;
2. For economic and non-economic damages in the second cause of action;
3. For economic and non-economic damages in the third cause of action.

Dated: June 25, 2013

GEOFFREY BECKER
Attorney for Plaintiff, Daniel Long

Request for Jury Trial

Plaintiff requests a jury trial.

Dated: June 25, 2013

10

Complaint-Breach of Contract, Negligence, Punitive Damages and Rescue Doctrine